UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| John Swiatek, individually and on behalf of all others similarly situated, | 1:23-cv-01523 |
| Plaintiff, | |
| - against - | Class Action Complaint |
| CVS Pharmacy, Inc., | Jury Trial Demanded |
| Defendant | |

Plaintiff alleges upon information and belief, except for allegations about Plaintiff, which are based on personal knowledge:

1. CVS Pharmacy, Inc. ("Defendant") sells "Dry Mouth Discs" described as a "dietary supplement" promising "to provide lasting moisture," "Soothe[s] dry tissue[]," "Promote[s] a healthy mouth" and "Freshen[s] breath" under its CVS Health brand ("Product").



**I.    DRY MOUTH OR XEROSTOMIA**

2.    Saliva is an extracellular fluid comprised of 99 percent water, produced and secreted by salivary glands in the mouth.

3.    Saliva plays a significant role in oral health, by washing away food and debris from teeth and gums, neutralizing acids and providing high levels of calcium, fluoride and phosphate ions at the tooth surface.

4.    Adequate saliva production reduces the incidence and severity of carious lesions and dental erosion.

5.    Dry mouth or xerostomia is characterized by partial or total loss of saliva production caused by the hypofunction of the salivary glands, affecting about 25% of the population.

6.    Its causes include (1) autoimmune diseases, (2) side effects of multiple medications, (3) head and neck irradiation and (4) systemic cancer therapy.[1]

7.    Xerostomia significantly increases the risk of dental caries, demineralization, tooth sensitivity, dental erosion, candidiasis, and other oral diseases.

**II.    ORAL MOISTURIZERS**

8.    To alleviate symptoms of dry mouth, the Product tells purchasers its use will "provide lasting moisture," next to a body of water with droplets of water, references to its ability to stimulate saliva production and provide lubricating effects.

9.    Notwithstanding whether the Product can stimulate saliva, it is highly acidic, with a pH of 5.3, significantly less than the critical pH of enamel or root dentin, between 6 and 6.9.[2]

---

[1] Estimates are that 63% of the 200 most common medications have a xerogenic effect, resulting in reduced salivary flow rates.
[2] Laboratory testing based on titratable acidity using a pH meter, pH indicator and gravimetric analysis.

10. The result is that the tooth structure begins to erode, confirmed by one study showing use of the Product caused 1% tooth loss.

11. The dangers of these oral moisturizers has been known to dental professionals through publications in dental journals, which subjected the Product to laboratory analysis.[3]

12. The conclusion was that unless such products are formulated to have an acidity level of about 6.7 pH or higher, their use will contribute to demineralization, dental erosion, sensitivity, and caries.

13. In light of the Product's acidity, its representation as beneficial to oral health and the alleviation of dry mouth is misleading.

14. This is because, in part, it fails to inform purchasers of the likelihood of demineralization, dental erosion, greater sensitivity, and higher incidences of dental caries.

## III. MISLEADING DIETARY SUPPLEMENT CLAIM

15. Though the Product is identified as a "dietary supplement," it unlawfully claims to "mitigate … disease" through its effects on salivary gland disorders using lay terminology, "to provide lasting moisture." 21 CFR 101.93(g)(2)(ii).

Jurisdiction and Venue

16. Jurisdiction is based on the Class Action Fairness Act of 2005 ("CAFA"). 28 U.S.C. § 1332(d)(2).

17. The aggregate amount in controversy exceeds $5 million, including any statutory and punitive damages, exclusive of interest and costs.

---

[3] Delgado, Alex J., and Vilhelm G. Olafsson. "Acidic oral moisturizers with pH below 6.7 may be harmful to teeth depending on formulation: a short report." Clinical, Cosmetic and Investigational Dentistry (2017): 81-83; Delgado, Alex J., Vilhelm G. Olafsson, and Terence E. Donovan. "pH and erosive potential of commonly used oral moisturizers." Journal of Prosthodontics 25.1 (2016): 39-43.

18. Plaintiff is a citizen of Illinois.

19. Defendant is a Rhode Island corporation with a principal place of business in Woonsocket, Providence County, Rhode Island.

20. The class of persons Plaintiff seek to represent includes persons who are citizens of different states from which Defendant is a citizen.

21. The members of the class Plaintiff seeks to represent are more than 100, because the Product has been sold with the representations described here, in thousands of CVS stores and online, in the States Plaintiff seeks to represent.

22. 85% of Americans live within 10 miles of a CVS.

23. CVS stores get close to 5 million customers a day, which means only 0.00002 percent of these people would need to purchase the Product per day to exceed the 100 person requirement.

24. The members of the classes Plaintiff seek to represent are more than 100, because the Product has been sold with the representations described here from thousands of locations including grocery stores, dollar stores, drug stores, convenience stores, big box stores, and/or online, across the States covered by the proposed classes.

25. Venue is in this District with assignment to the Eastern Division because a substantial part of the events or omissions giving rise to these claims occurred in Cook County, including Plaintiff's purchase and use of the Product, reliance on the representations, and/or subsequent awareness they were false and misleading.

## Parties

26. Plaintiff John Swiatek is a citizen of Island Lake, Lake County, Illinois.

27. Defendant CVS Pharmacy, Inc. is a Rhode Island corporation with a principal place of business in Woonsocket, Providence County, Rhode Island.

28. Founded as Consumer Value Stores almost sixty years ago in Massachusetts, CVS has consistently been a place for consumers to fill their most important needs.

29. Originally selling a variety of goods, CVS became focused on meeting the healthcare needs of Americans and is a leading pharmacy and healthcare company.

30. From the almost ten thousand CVS stores in all 50 states, consumers have confidence CVS is looking out for their health.

31. Consumers consistently rank CVS as giving them the most value for their money, in addition to relying on the advice of their trained staff and pharmacists.

32. According to surveys, the CVS brand enjoys a high level of trust from the public, more than other national pharmacies.

33. CVS has been known for its values and unique approach to business and community, through its ethics, transparency to investors and customers, and philanthropy.

34. While CVS stores sell leading national brands, they also sell a large number of products under one of their private label brands, CVS Health.

35. Private label products are made by third-party manufacturers and sold under the name of the retailer, or its sub-brands.

36. Previously referred to as "generic" or "store brand," private label products have increased in quality, and often are superior to their national brand counterparts.

37. Products under the CVS Health brand have an industry-wide reputation for quality and value.

38. In releasing products under the CVS Health brand, Defendant's foremost criteria was to have high-quality products that were equal to or better than the national brands.

39. Defendant is able to get national brands to produce its private label items due its loyal

customer base and tough negotiating.

40. That CVS Health branded products met this high bar was proven by focus groups, which rated them above the name brand equivalent.

41. Private label products generate higher profits for retailers because national brands spend significantly more on marketing, contributing to their higher prices.

42. A survey by The Nielsen Co. "found nearly three out of four American consumers believe store brands are good alternatives to national brands, and more than 60 percent consider them to be just as good."

43. Private label products under the CVS Health brand benefit by their association with consumers' appreciation for the CVS brand as a whole.

44. The development of private label items is a growth area for CVS, as they select only top suppliers to develop and produce CVS Health products.

45. The Product is available to consumers in this District from Defendant's retail stores and website.

46. Plaintiff purchased the Product on one or more occasions within the statutes of limitations for each cause of action alleged, at CVS locations including 25 Northwest Hwy Cary, Illinois, 60013, between 2021 and 2023, and/or among other times.

47. Plaintiff expected the Product would be beneficial to oral health by alleviating the symptoms of dry mouth by stimulating saliva production and mitigate salivary gland disorders because he read the words, "Dry Mouth Discs" and "provide lasting moisture," next to a picture of water with droplets of water.

48. Plaintiff was not aware that because of the Product's acidity, it was detrimental to oral health by contributing to demineralization, dental erosion, sensitivity, and caries and that it

6

was not authorized to claim to mitigate salivary gland disorders.

49. As a result of the false and misleading representations, the Product is sold at premium price, approximately not less than $ 9.29 per 40 lozenges, excluding tax and sales.

50. Plaintiff bought the Product at or exceeding the above-referenced price.

51. Plaintiff paid more for the Product, would have paid less or not have purchased it had he known the representations and omissions were false and misleading.

52. The value of the Product that Plaintiff purchased was materially less than its value as represented by Defendant.

53. Plaintiff chose between this Product and others represented similarly, but which did not misrepresent their attributes, requirements, instructions, features, and/or components.

54. Plaintiff intends to, seeks to, and will purchase the Product again when he can do so with the assurance its representations are consistent with its abilities, attributes, and/or composition, and that it's pH level will not render it harmful.

55. Plaintiff is unable to rely on the labeling and representations not only of this Product, but other dry mouth products, because he is unsure whether those representations are truthful.

56. If Defendant's labeling were to be truthful, Plaintiff could rely on the labeling of other dry mouth relief products.

Class Allegations

57. Plaintiff seeks certification under Fed. R. Civ. P. 23 of the following classes:

> **Illinois Class:** All persons in the State of Illinois who purchased the Product during the statutes of limitations for each cause of action alleged; and
>
> **Consumer Fraud Multi-State Class**: All persons in the States of Utah, North Dakota, Kansas, Mississippi, Arkansas, Alaska, Wyoming and South Carolina who purchased the Product during the statutes of limitations for each cause of action

alleged.

58. Common questions of issues, law, and fact predominate and include whether Defendant's representations were and are misleading and if Plaintiff and class members are entitled to damages.

59. Plaintiff's claims and basis for relief are typical to other members because all were subjected to the same unfair, misleading, and deceptive representations, omissions, and actions.

60. Plaintiff is an adequate representative because his interests do not conflict with other members.

61. No individual inquiry is necessary since the focus is only on Defendant's practices and the class is definable and ascertainable.

62. Individual actions would risk inconsistent results, be repetitive and are impractical to justify, as the claims are modest relative to the scope of the harm.

63. Plaintiff's counsel is competent and experienced in complex class action litigation and intends to protect class members' interests adequately and fairly.

64. Plaintiff seeks class-wide injunctive relief because the practices continue.

<u>Illinois Consumer Fraud and Deceptive Business Practices Act<br>("ICFA"), 815 ILCS 505/1, *et seq.*</u>

65. Plaintiff incorporates by reference all preceding paragraphs.

66. Plaintiff purchased the Product to be beneficial to oral health by alleviating the symptoms of dry mouth by stimulating saliva production and mitigate salivary gland disorders even though it failed to inform purchasers of the likelihood of demineralization, dental erosion, greater sensitivity, and higher incidences of dental caries.

67. Plaintiff would not have purchased the Product or paid as much if the true facts had been known, suffering damages.

Violation of State Consumer Fraud Acts
(Consumer Fraud Multi-State Class)

68. The Consumer Fraud Acts of the States in the Consumer Fraud Multi-State Class are similar to the consumer protection statute invoked by Plaintiff and prohibit the use of unfair or deceptive business practices in the conduct of commerce.

69. The members of the Consumer Fraud Multi-State Class reserve their rights to assert their consumer protection claims under the Consumer Fraud Acts of the States they represent and/or the consumer protection statute invoked by Plaintiff.

70. Defendant intended that members of the Consumer Fraud Multi-State Class would rely upon its deceptive conduct, which they did, suffering damages.

Breaches of Express Warranty,
Implied Warranty of Merchantability/Fitness for a Particular Purpose
and Magnuson Moss Warranty Act, 15 U.S.C. §§ 2301, *et seq.*

71. The Product was manufactured, identified, marketed, and sold by Defendant and expressly and impliedly warranted to Plaintiff that it would improve oral health by alleviating the symptoms of dry mouth and mitigate salivary gland disorders even though it failed to inform purchasers of the likelihood of demineralization, dental erosion, greater sensitivity, and higher incidences of dental caries.

72. Defendant directly marketed the Product to Plaintiff through its advertisements and marketing, through various forms of media, on the packaging, in print circulars, direct mail, product descriptions, and targeted digital advertising.

73. Defendant knew the product attributes that potential customers like Plaintiff were seeking, including dry mouth relief, increased saliva production, and moisturizing, and developed its marketing and labeling to directly meet their needs and desires.

74. The representations about the Product were conveyed in writing and promised it

9

would be defect-free, and Plaintiff understood this meant it would improve oral health and did not expect it would be formulated to negatively affect oral health.

75. Defendant's representations affirmed and promised that the Product would improve oral health and not negatively affect oral health.

76. Defendant described the Product so Plaintiff believed that it would improve oral health and did not expect it would be formulated to negatively affect oral health, which became part of the basis of the bargain that it would conform to its affirmations and promises.

77. Defendant had a duty to disclose and/or provide non-deceptive promises, descriptions and marketing of the Product.

78. This duty is based on Defendant's outsized role in the market for OTC oral care products and custodian of the CVS Health brand, which contains numerous products that have helped alleviate oral conditions for decades.

79. Plaintiff recently became aware of Defendant's breach of the Product's warranties.

80. Plaintiff provided or provides notice to Defendant, its agents, representatives, retailers, and their employees that it breached the Product's warranties.

81. Defendant received notice and should have been aware of these issues due to complaints by consumers and third-parties, such as Greg Grillo, D.D.S., and including regulators and competitors, to its main offices and through online forums.

82. The Product did not conform to its affirmations of fact and promises due to Defendant's actions.

83. The Product was not merchantable because it was not fit to pass in the trade as advertised, not fit for the ordinary purpose for which it was intended and did not conform to the promises or affirmations of fact made on the packaging, container, or label, because it was

marketed as if it would improve oral health and did not expect it would be formulated to negatively affect oral health.

84. The Product was not merchantable because Defendant had reason to know the particular purpose for which it was bought by Plaintiff, because he expected it would improve oral health and did not expect it would be formulated to negatively affect oral health, and he relied on its skill and judgment to select or furnish such suitable product.

### Negligent Misrepresentation

85. Defendant had a duty to truthfully represent the Product, which it breached.

86. This duty was non-delegable, and based on Defendant's position, holding itself out as having special knowledge and experience in this area, the custodian of the CVS Health brand, consistently rated by Americans as being one of the most trusted private label brands of OTC products.

87. Defendant's representations regarding the Product went beyond the specific representations on its packaging and labels, as they incorporated its extra-labeling promises and commitments to quality it has been known for.

88. These promises were outside of the standard representations that other companies may make in a standard arms-length, retail context.

89. The representations took advantage of consumers' cognitive shortcuts made at the point-of-sale and their trust in Defendant.

90. Plaintiff reasonably and justifiably relied on these negligent misrepresentations and omissions, which served to induce and did induce, her purchase of the Product.

### Fraud

91. Defendant misrepresented and/or omitted the attributes and qualities of the Product,

that it would improve oral health and did not expect it would be formulated to negatively affect oral health.

92. The records Defendant is required to maintain, and/or the information inconspicuously disclosed to consumers, provided it with actual and constructive knowledge of the falsity or deception, through statement and omission, of the representations.

<u>Unjust Enrichment</u>

93. Defendant obtained benefits and monies because the Product was not as represented and expected, to the detriment and impoverishment of Plaintiff and class members, who seek restitution and disgorgement of inequitably obtained profits.

<u>Jury Demand and Prayer for Relief</u>

Plaintiff demands a jury trial on all issues.

**WHEREFORE**, Plaintiff prays for judgment:

1. Certifying Plaintiff as representative and the undersigned as counsel for the classes;

2. Entering preliminary and permanent injunctive relief by directing Defendant to correct the challenged practices to comply with the law;

3. Awarding monetary, statutory and/or punitive damages and interest;

4. Awarding costs and expenses, including reasonable attorney and expert fees; and

5. Other and further relief as the Court deems just and proper.

Dated: March 11, 2023

Respectfully submitted,

/s/ Spencer Sheehan
Sheehan & Associates, P.C.
60 Cuttermill Rd Ste 412
Great Neck NY 11021
(516) 268-7080
spencer@spencersheehan.com